UNITED STATE DISCTRICT COURT
EASTERN DISTRICT OF NEW YORK

TIMOTHY B. DERHAM,

          *Plaintiff,*

vs.

FARMERS INSURANCE EXCHANGE, TRUCK INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY and FARMERS NEW WORLD LIFE INSURANCE COMPANY,

          *Defendants.*

Civil Action No._____

**COMPLAINT**

*JURY TRIAL DEMANDED*

Plaintiff, TIMOTHY B. DERHAM, though the undersigned counsel, complains and alleges as follows:

## The Parties

1. Plaintiff is an individual who resides at 70 Huron Road, Bellerose, New York 11001.

2. Defendant, Farmers Insurance Exchange, is a California insurance company authorized to conduct the business of insurance in the State of New York with a principal place of business located in Los Angeles, California.

3. Defendant, Truck Insurance Exchange, is a California insurance company authorized to conduct the business of insurance in the State of New York with a principal place of business located in Los Angeles, California.

4. Defendant, Fire Insurance Exchange, is a California insurance company authorized to conduct the business of insurance in the State of New York with a principal place of business located in Los Angeles, California.

5. Defendant, Mid-Century Insurance Company, is a California insurance company authorized to conduct the business of insurance in the State of New York with a principal place of business located in Los Angeles, California.

6. Defendant, Farmers New World Life Insurance Company, is a Washington insurance company with a principal place of business located in Bellevue, Washington.

## Jurisdiction & Venue

7. This is an action for equitable relief and compensatory damages where the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs. This Court has jurisdiction by reason of 28 U.S.C. §1332(a).

8. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391 (b)(2) and (3).

## Background Facts

9. Plaintiff has been a New York State licensed property and casualty insurance agent for over 19 years and a New York State licensed life, accident and health insurance agent for over 19 years. Since 1996, Plaintiff has been a New York State licensed property and casualty insurance broker.

10. Plaintiff has been an appointed insurance agent for the Defendants since 2013, successfully establishing and running two insurance agencies in Long Island and New York City under the Farmers Insurance Group banner.

11. Plaintiff's appointment with the Defendants was the result of two agency appointment agreements dated November 1, 2013 (New York City) and September 1, 2015 (Long Island) (the "Agency Agreements").

12. Prior to his work with the Defendants, Plaintiff had a successful career as an Allstate agent, building an agency from inception to a $3,000,000 book of business when it was sold.

13. Plaintiff's insurance agency career was equally successful with the Defendants. During his tenure with the Defendants, Plaintiff was one of the top producing agents for his region with a stellar record of achievements, including being a member of the Farmers' Topper Club for three years, which is an honor and distinction awarded to the top ten percent of Farmers Insurance Group agents nationally. He was one of the first appointed agents for the Defendants in New York State. He further was a member of New York State Farmers Agent's Advisory Council and was involved in recruiting and mentoring a number of successful insurance agents to work for Defendants.

14. In fact, during his tenure with the Defendants, Plaintiff grew his book of business for the Defendants from zero accounts to approximately $3,000,000 in premium for several years prior to his termination in breach of his two contracts with the Defendants.

**Termination of the Plaintiff's Agency Appointment(s)**

15. Starting in the summer of 2019, the Defendants began to take systematic actions to improperly terminate the Plaintiff in breach of their contracts with him.

16. First, with his New York City Office, they refused to approve the new lease for his office space causing the Plaintiff to have to rent temporary space without ever obtaining the required approval under the Agency Agreements.

17. Second, the Defendants created a means by which customers policies would be canceled and, rather be reinstated at the same premium rate with a no loss

letter as typically done in the insurance industry, the Defendants would require the Plaintiff and his agents to rewrite the policies at a higher premium rate (known as "cancel/rewrite"). In addition, the Defendants allowed these new policies to be written and bound on a premium less than required for the deposit and without having the agent collect the earned premium on the canceled policy.

18. Using this as their means to find reasons to terminate the Plaintiff, the Defendants found 13 accounts over a two year period where they claim the Plaintiff allowed this to occur when, in fact, it was their own system that allowed this to occur. In fact, Farmers agents were directed to handle it this way by the Defendants which, in turn, created uncollected earned premiums which the Defendants very rarely sought to collect against its insureds.

19. Next, in the fall of 2019, the Defendants claimed that the cancel/rewrites of the 13 accounts cost them approximately $40,000 in uncollected earned premium.

20. The Defendants also attempted to claim that the Plaintiff embezzled $250 dollars on an approximately $3,000,000 book of business as a reason for his termination when that amount of uncollected premium was merely only lost by the agency and deposited within 10 days of it being collected.

21. The Defendants next attempted to claim the Plaintiff improperly accepted payments for the insureds from the automobile dealership, Plaza Auto Mall, which had sold them an automobile and processed their payment through their offices at the dealership. In fact, the Defendants claim that they found for the first time in October 2019 that 360 payments were made by a single bank account number over a two year period through an EFT payment which did not include the account owner's name when these

payments were made. In addition, while the Defendants claim that these improper payments amounted to $138,000 they never identified any underwriting guidelines, statutes or insurance regulations which shows that a payment collected by an automobile dealership was improper and, further, the Defendants never returned any of alleged improper payments to this EFT account. Each and every time the account number was utilized, it was inputted into the Defendants' computer system and the Defendants never once raised an objection that the account number was being utilized excessively or improperly over this two-year time frame.

22. When these issues where finally brought to the Plaintiff's attention, the Plaintiff immediately took action and terminated those individuals claimed to be responsible for the alleged improper action.

23. Plaintiff also contacted eleven customers involved in in the cancel/rewrite process created and directed by the Defendants (out of the approximately 1200 accounts maintained by Plaintiff's agencies) and explained to them what had transpired and the amounts they owed on their policies.

24. Plaintiff further implemented stricter oversight over his agency operations and also started reviewing all accounts with the Defendants through the Defendants' review process.

25. Despite the numerous and substantive efforts made by Plaintiff to alleviate the claimed wrongdoing by his employees, including an offer to reimburse Defendants the amount of the earned premium they alleged they expected , and despite the long-standing contractual relationship between the parties, on January 2, 2020, Defendants summarily terminated the Agency Agreements.

26. Defendants terminated the Agency Agreements by claiming that Plaintiff failed to collect and promptly remit monies due Defendants; failed to service all policyholders of Defendants in such a manner as to advance the interests of the policyholders, potential policyholders, or other agents of Defendants; failed to conduct business in accordance with the published policies, rules and guidelines of Defendants; committed fraud, embezzlement, conversion, misappropriation or theft in connection with Plaintiff agencies, or disappearance of premium or property belonging to Defendants or a consumer which is not explained to the Defendants' satisfaction, or failure to promptly remit required funds to the Defendants; made misrepresentations material to the operation of the Plaintiff's agencies or Defendants; engaged in conduct that is disparaging of or detrimental to Defendants; and failed to confirm to normal good business practice, and all local, state and federal laws governing the conduct of the Defendants, their agents and individuals working for Plaintiff.

27. The Defendants also attempted to claim that the Plaintiff was improperly involved in another insurance agency and insurance company even though they were well aware of these relationships, participated in meetings at the other agency, sent emails to the Plaintiff at the other agency and several management team members for the Defendants attended a ceremony where the Plaintiff being name the president of a risk retention group some two years before he was improperly terminated by the Defendants.

28. The grounds set forth by Defendants in their termination notice were subjective, arbitrary, meritless and primarily based on acts that the Defendants directed and/or condoned.

29. Prior to the events in June-October 2019 aforesaid, Plaintiff was never made aware of any issue or problem raised by Defendants with respect to his agencies or agency operations.

30. Following termination, Plaintiff requested, under the 2013 Agency Agreement, that a Termination Review Board ("TRB") be empaneled so that he could contest the termination.

31. According to the Defendants' written overview, the TRB is an informal, private proceeding before a three-member board made up of the President's Council agent chosen by the agent who received the notice of termination, a representative of the Defendants, and an independent third-party member selected by the other two members.

32. In conjunction with his preparation for the TRB proceedings, Plaintiff, through counsel, repeatedly requested that Defendants disclose any documentation or evidence that Defendants' possessed to support its termination of the Agency Agreements so that Plaintiff could meaningfully prepare for the proceedings and prepare a proper defense for the unfounded and meritless claims.  Despite these repeated demands, Defendants refused to provide any documents in support of its termination of the Agency Agreements until the day of the actual TRB proceeding (June 2, 2020).

33. Likewise, it was only after repeated demands did Defendants finally disclose to Plaintiff the name of the third "impartial" TRB Member who would preside over the proceedings.  This disclosure was absolutely necessary to determine whether the third-chosen TRB Member had any conflict of interest and potential bias/partiality.

34. In fact, the Plaintiff did not learn who the third impartial TRB Member was until the first attempted TRB proceeding on February 7, 2020 where it was learned that

7

there was an actual conflict and that the TRB had to be adjourned to a later date. As a result of this debacle, the Defendants relented and provided the name of the third TRB Member well before the June 2, 2020 TRB proceeding, but still refused to provide any documentation to support their claims until the day of the proceeding. Clearly there was no time for the Plaintiff and his counsel to review and properly analyze the voluminous documents used by the Defendants at the proceeding, which made the TRB proceeding a complete sham and not conducted in fair and good faith manner as would be expected under any contract.

35. On June 2, 2020, following this "sham" TRB proceeding, the Defendants claim that:

> the Termination Review Board has submitted a summary of the proceeding and [the TRB's] recommendations to the Home Office for review."
>
> ............................................
>
> After such review, it was concluded to uphold the decision to terminate your appointment agreement.

However, the Defendants failed to provide the Plaintiff with summary and/or recommendations from the TRB nor did it provide any basis for its conclusion or who at Defendants' Home Office made the actual decision to affirm the termination.

36. In fact, the decision of the TRB was actually predetermined before the June 2, 2020 hearing, as demonstrated by the Defendants' actions, to wit:

    a.    Starting the summer of 2019, with failing to approve the new lease for the Plaintiff's New York City Office;

  b. Issuing a termination letter on January 2, 2020 with no explanation and providing no ability for the Plaintiff to continue to operating his agencies while awaiting the TRB proceedings;

  c. By notifying the New York Department of Financial Services of the termination in late January 2020 even though there was no final determination of the termination; and

  d. By serving the Plaintiff with a Deferred Compensation Plan Termination Distribution, indicating that the distribution was the result of Plaintiff's termination just prior to the TRB on June 2, 2020.

 37. Defendants lacked good cause for termination of Plaintiff's agency appointments and terminated the agency appointments in bad faith. The reasons given to Plaintiff were pre-textual and used as an excuse to remove Plaintiff from his agencies and transfer that business to other Farmer's agents without proper compensation.

**Count One**
**(Specific Performance)**

 38. Plaintiff incorporates the averments in paragraphs 1 through 37 as if fully set forth herein.

 39. As a result of the foregoing, Plaintiff's insurance agency businesses have been shut down in an unfair and improper manner.

 40. Plaintiff cannot access his business computers, files, networks or any other critical information that is essential to the operation and continuation of his business. As a result, Plaintiff's hands are completely tied and he is unable to operate a business that he successfully built over the last several years. Additionally, Defendants' actions have left thousands of customers that heavily relied upon Plaintiff scrambling without knowing

who to pay, what to do about cancellation notices or claims, or who to contact to renew insurance. This has caused and continues to cause tremendous damage to Plaintiff's goodwill and business reputation.

41. Defendants should be directed to honor the parties' Agreements.

42. Plaintiff has no adequate remedy at law and an immediate injunction is needed to prevent irreparable harm to Plaintiff's business and reputation.

43. By reason of the foregoing, Plaintiff requests equitable relief in the form of specific performance and immediate injunctive relief.

## Count Two
### (Breach of Contract – 2013 Agency Agreement)

44. Plaintiff incorporates the averments in paragraphs 1 through 43 as if fully set forth herein.

45. The contractual relationship between Plaintiff and Defendants is governed by the Agency Agreements dated November 1, 2013 and September 1, 2015.

46. The Defendants breached the 2013 Agency Agreement in or more of the following ways:

a. By failing to pay new business and service commissions to Plaintiff in accordance with commission schedules and rules as established by the Defendants and in effect on the effective date of a commission transaction as required by the 2013 Agency Agreement (Paragraph A.1).

b. By failing to provide approved manuals, forms and policyholder records necessary for the Plaintiff to carry out his duties and obligations under the 2013 Agency Agreement (Paragraph A.3).

  c. By interfering with and refusing to approve the location of the Plaintiff's New York City Office, with such refusal being made in bad faith and in breach of the 2013 Agency Agreement (Paragraph B.2).

  d. By terminating Plaintiffs' agency appointment without providing the requisite three months written notice, in breach of the 2013 Agency Agreement (Paragraph D.1.) and using pretextual claims to allegedly terminate the 2013 Agency Agreement for cause;

  e. By terminating Plaintiffs' agency appointment without providing the requisite 30 days written notice, in breach of the 2013 Agency Agreement (Paragraph D.2.) and using pretextual claims to allegedly terminate the 2013 Agency Agreement for cause;

  f. By terminating Plaintiffs' agency appointment using pretextual claims, thus preventing the Plaintiff from receiving post termination commissions, in breach of the 2013 Agency Agreement (Paragraph F.);

  g. By terminating Plaintiffs' agency appointment using pretextual claims, thus preventing the Plaintiff from selling his agencies, in breach of the 2013 Agency Agreement (Paragraph G.);

  h. By terminating Plaintiffs' agency appointment using pretextual claims and failing to provide Plaintiff with "Contract Value" for his agencies, despite due demand, in breach of the 2013 Agency Agreement (Paragraph H).

  47. Plaintiff fully performed his obligations under the 2013 Agency Agreement.

  48. As a result of Defendants' breaches of the 2013 Agency Agreement, as aforesaid, Plaintiff has sustained loss including the value of his agencies, loss of investment capital, loss of his book of business and a substantial loss of income.

## Count Three
### (Breach of Contract - 2015 Agency Agreement)

49. Plaintiff incorporates the averments in paragraphs 1 through 48 as if fully set forth herein.

50. The contractual relationship between Plaintiff and Defendants is governed by the Agency Agreements dated November 1, 2013 and September 1, 2015.

51. The Defendants breached the 2015 Agency Agreement in or more of the following ways:

   a. By failing to pay new business and service commissions to Plaintiff in accordance with commission schedules and rules as established by the Defendants and in effect on the effective date of a commission transaction as required by the 2015 Agency Agreement (Paragraph A.1).

   b. By failing to provide approved manuals, forms and policyholder records necessary for the Plaintiff to carry out his duties and obligations under the 2015 Agency Agreement (Paragraph A.2).

   c. By failing to provide advertising assistance necessary for the Plaintiff to carry out his duties and obligations under the 2015 Agency Agreement (Paragraph A.3).

   d. By failing to provide education and sales training programs necessary for the Plaintiff to carry out his duties and obligations under the 2015 Agency Agreement (Paragraph A.4).

   e. By terminating Plaintiffs' agency appointment without providing the requisite three months written notice, in breach of the 2015 Agency Agreement (Paragraph E.1.) and using pretextual claims to allegedly terminate the 2015 Agency Agreement for cause;

  f. By terminating Plaintiffs' agency appointment without providing the requisite 30 days written notice, in breach of the 2015 Agency Agreement (Paragraph E.2.) and using pretextual claims to allegedly terminate the 2015 Agency Agreement for cause;

  g. By terminating Plaintiffs' agency appointment using pretextual claims, thus preventing the Plaintiff from receiving post termination commissions, in breach of the 2015 Agency Agreement (Paragraph F.);

  h. By terminating Plaintiffs' agency appointment using pretextual claims, thus preventing the Plaintiff from selling his agencies, in breach of the 2015 Agency Agreement (Paragraph G.); and

  i. By terminating Plaintiffs' agency appointment using pretextual claims and failing to provide Plaintiff with "Contract Value" for his agencies, despite due demand, in breach of the 2015 Agency Agreement (Paragraph H).

  52. Plaintiff fully performed his obligations under the 2015 Agency Agreement.

  53. As a result of Defendants' breaches of the 2015 Agency Agreement, as aforesaid, Plaintiff has sustained loss including the value of his agencies, loss of investment capital, loss of his book of business and a substantial loss of income.

**Count Four**
**(Breach of Good Faith & Fair Dealing)**

  54. Plaintiff incorporates the averments in paragraphs 1 through 53 as if fully set forth herein.

  55. The contractual relationship between Plaintiff and Defendants is governed by the Agency Agreements dated November 1, 2013 and September 1, 2015.

  56. Plaintiff fully performed his obligations under the Agency Agreements.

57. Defendants' termination of the Agency Agreements was improper and unsubstantiated.

58. By terminating the Agency Agreements in such a manner, Defendants breached the implied covenant of good faith and fair dealing inherent in all contracts.

59. In terminating the Agency Agreements, Defendants has effectively engaged in a hostile takeover of Plaintiff's agencies and his book of business of which he developed and grew to its current levels.

60. As a result of Defendants' breach of the covenant of good faith and fair dealing as aforesaid, Plaintiff has suffered losses, including but not limited to, termination of his agency appointments, loss of his substantial book of business and loss of income.

### Count Five
### (Unjust Enrichment-Quantum Meruit)

61. Plaintiff incorporates the averments in paragraphs 1 through 60 as if fully set forth herein.

62. As a result of the agency appoint agreements in place between Plaintiff and Defendants, Plaintiff developed, maintained and significantly increased his book of business, the benefit of which inured to Defendants.

63. Plaintiff brought numerous customers to Defendants, cultivated those insurance customers and retained those customers.

64. By virtue of the agency appoint agreements, Defendants enticed Plaintiff into developing a large profitable book of business which it then appropriated so that it could retain the customers developed by Plaintiff to distribute to other agents of Defendants and avoid paying Plaintiff just compensation for his efforts.

65. Defendants received a significant benefit from Plaintiff's efforts to develop a book of business when it effectively engaged in a hostile takeover of Plaintiff's insurance customers.

66. As a result, Defendants were unjustly enriched to the detriment of Plaintiff.

67. Plaintiff, therefore, is entitled to a *quantum meriut* recovery for his losses, including but not limited to, termination of his agency appointments, loss of investment capital, loss of his book of business, and loss of income.

## Count Six
### (Violation of New York General Business Law §349)

68. Plaintiff incorporates the averments in paragraphs 1 through 67 as if fully set forth herein.

69. New York General Business Law §349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.

70. By various forms of insurance to New York residents, Defendants conduct "business" or provides a "service" within the meaning of New York General Business Law §349.

71. Defendants have engaged in deceptive acts and practices in the conduct of their business or provision of their services, in violation of New York General Business Law § 349, by engaging in and/or condoning a cancel/rewrite process by which Defendants' customers policies would be canceled and, rather be reinstated at the same premium rate with a no loss letter as typically done in the insurance industry, the Defendants would require the Plaintiff and his agents to rewrite the policies at a higher premium rate. In addition, the Defendants allowed these new policies to be written and

bound on a premium less than required for the deposit and without having the agent collect the earned premium on the canceled policy.

72. Upon information and belief, Defendants' "cancel/rewrite" process preyed upon insurance consumers who could not afford the premiums for the Defendant's products and/or services but permitted the Defendants to consider this as earned premium and significantly bolsters their premium volume.

73. Defendants' deceptive acts and practices were consumer-oriented conduct in that they were designed to mislead automobile insurance consumers into believing that they could simply rewrite their canceled insurance policies without higher premiums or that their as no risk in the collection of earned premium from the canceled policies.

74. Plaintiff was deceived and injured by Defendants' deceptive acts and practices insofar as the cancel/rewrite practice (and the uncollected earned premium associated with the cancelled policies) was used by Defendants as subterfuge to terminate the Plaintiff's agency appointments, despite the fact that such practice was permitted, condoned and approved by the Defendants.

75. As a result of the Defendants' violations of New York General Business Law § 349, Plaintiff is entitled to recover actual damages in an amount to be determined at trial, an award of reasonable attorney's fees and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

A. entry of judgment in favor of Plaintiff against Defendants on all claims for relief;

B. an order enjoining Defendants, its officers, agents, servants, employees, attorneys, and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with it, from terminating the Agency Agreements and assigning Plaintiff's customer accounts to other agents of the Defendants;

C. an order awarding Plaintiff damages he has sustained as a result of Defendants' breach of contract in an amount according to proof;

D. an order awarding Plaintiff damages he has sustained as a result of Defendants' bad faith in an amount according to proof;

E. an order awarding Plaintiff damages he has sustained as a result of Defendants' unjust enrichment in an amount according to proof;

F. prejudgment interest;

G. punitive damages;

H. attorney's fees; and

I. any and all other legal and equitable relief as may be available under law the Court may deem proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

Dated:  July 20, 2020
        White Plains, New York

                                               Respectfully,

                                               Christopher B. Weldon, Esq.
                                               Darren P. Renner, Esq.
                                               Keidel, Weldon & Cunningham, LLP
                                               *Attorneys for the Plaintiff*
                                               925 Westchester Avenue
                                               Suite 400
                                               White Plains, New York 10604
                                               (T) 914-948-7000
                                               (F) 914-948-7010
                                               cweldon@kwcllp.com
                                               drenner@kwcllp.com